MEGHAN BLANCO
(State Bar No. 238171)
LAW OFFICES OF MEGHAN BLANCO
28202 Cabot Road, Suite 300
Laguna Niguel, California 92677
Telephone: (949) 296-9869
Fax: (949) 606-8988
mblanco@meghanblanco.com

DAMON ALIMOURI
(State Bar No. 308453)
LAW OFFICE OF DAMON ALIMOURI
595 E Colorado Blvd. #335
Pasadena, CA 91101
Telephone: (626) 314-3595
Fax: (626) 270-4377
da@da-lawoffice.com

Attorneys for Defendant:
TORRENCE HATCH

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | Case No.: 23-CR-1201-CAB |
| Plaintiff, | ) ) ) | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT |
| vs. | ) ) | |
| TORRENCE HATCH, | ) ) | |
| Defendant. | ) ) ) | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION………………………………… …………….....…....…4

SUMMARY…………………………………… ………………...…....…..4

ARGUMENT …………………………………………………...…….........5

*BRUEN* ADOPTED A NEW APPROACH TO THE SECOND AMENDMENT, OVERRULING CONTRARY NINTH CIRCUIT PRECEDENT. …….....…....6

*BRUEN* OVERHAULED THE TEST FOR DETERMINING WHETHER GOVERNMENT ACTION INFRINGES ON THE RIGHT TO KEEP AND BEAR ARMS. ……………………………………………………………..….….7

*BRUEN* ALSO ABROGATED PRIOR CASE LAW RELYING ON "PRESUMPTIVELY LAWFUL" EXCEPTIONS TO THE SECOND AMENDMENT. ………………………………………………………… 9

THE SECOND AMENDMENT'S PLAIN TEXT COVERS MR. HATCH'S CONDUCT. …………………………………………………...……. 12

THE GOVERNMENT CANNOT SHOW "AN AMERICAN TRADITION" THAT INDIVIDUALS CONVICTED OF A FELONY MAY NOT POSSESS A GUN... 13

FOREVER DEPRIVING ALL PEOPLE CONVICTED OF A FELONY OF THEIR RIGHT TO BEAR ARMS DOES NOT COMPORT WITH COLONIAL AND FOUNDING-ERA HISTORY. ………………………………………………15

FOUNDING-ERA STATUTES AND REGULATIONS……………...….....… 16

PROPOSALS FROM STATE CONSTITUTIONAL CONVENTIONS…..…….…...17

EXECUTION OF FELONS AND THE "VIRTUOUS CITIZEN" THEORY……....…19

FOREVER DEPRIVING ALL FELONS OF THEIR RIGHT TO BEAR ARMS DOES NOT COMPORT WITH 19TH-CENTURY HISTORY……………………….…….…20

ALTHOUGH 20TH-CENTURY HISTORY IS IRRELEVANT TO THE SECOND AMENDMENT'S SCOPE, IT CONFIRMS THAT § 922(G)(1) IS INCOMPATIBLE WITH THE NATION'S HISTORY AND TRADITION OF FIREARM REGULATION… ……….22

THIS COURT SHOULD HOLD AN EVIDENTIARY HEARING…………….……24

CONCLUSION……………………………………………………..……24

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Over a decade ago, Torrence Hatch was convicted of possessing marijuana for sale. He was thereafter convicted of possessing marijuana. Both convictions were felonies, and Mr. Hatch served state prison terms for these relatively minor indiscretions. Following his release years ago, he has remained a gainfully employed, productive family man and hip-hop luminary, with no meaningful criminal record. Yet on account of two marijuana-related convictions, the government bars Mr. Hatch forever from possessing firearms. Application of the "felon in possession" ban against Mr. Hatch violates the Second Amendment.

**II.      SUMMARY**

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees an individual right to keep and bear arms unconnected with militia service. *District of Columbia v. Heller,* 554 U.S. 570, 583–84 (2008). In view of that right, the Court held unconstitutional a District of Columbia law that banned handguns and required other "firearms in the home be rendered and kept inoperable at all times." *Id.* at 630. It reached that conclusion after scrutinizing the text of the Second Amendment and deducing that it "codified a pre-existing right." *Id.* at 592. The *Heller* opinion did not apply intermediate or strict scrutiny. In fact, it did not apply any scrutiny at all. But in response to Justice Breyer's dissent, the Court noted in passing that the challenged law would be unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id*. at 628–29.

Courts around the country overread that passing comment to require a two-step approach in Second Amendment cases, utilizing means-end scrutiny at the second step. The Ninth Circuit did so in *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc), petition for cert. filed, (U.S. May 11, 2021) (No. 20-1639).

Roughly a year later, *Bruen* rejected the two-step approach as "one step too many." *New York St. Rifle and Pistol Ass'n v. Bruen*, 597 US __; 142 S. Ct. 2111 (2022). The Supreme Court declared: "Heller and McDonald do not support applying means-end scrutiny in the Second Amendment context." *Id.* Instead, those cases teach "that when the Second Amendment's plain

1    text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at

2    2126. And "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a

3    court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified

4    command.'" *Id*. (*quoting Konigsberg v. State Bar of Cal*., 366 U.S. 36, 50 n.10 (1961)).

5        *Bruen* instructs lower courts to first decide whether the text of the Second Amendment applies

6    to a person and his or her proposed conduct. 142 S. Ct. at 2134–35. If it does, the government

7    bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the

8    historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127.

9        The person in question is Mr. Hatch – a non-violent felon whose gun rights were stripped on

10   account of two decades-old marijuana convictions.[1] The conduct in question is Mr. Hatch's

11   transient possession of a firearm during a music video shoot on private property in San Diego.

12   Mr. Hatch is a person under the Second Amendment. *Range v. United* States, ___ (3d Cir. 2023)

13   (*quoting Binderup v. Att'y Gen*., 836 F.3d 336, 344 ("That individuals with Second Amendment

14   rights may nonetheless be denied possession of a firearm is hardly illogical.") (Ambro, J.) and

15   *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) ("all people have the right to keep and bear

16   arms," though the legislature may constitutionally "strip certain groups of that right.") (J.

17   Barrett)). And his conduct – possessing a firearm on private property – is also protected by the

18   Second Amendment. *Heller,* 554 U.S. at 583.

19       Here, as in *Bruen*, the government cannot meet its burden to show a historical tradition of

20   restricting people with non-violent marijuana convictions from possessing firearms. From 17th-

21   century England through Reconstruction, there is no historical analogue of disarming whole

22   swaths of the populace simply because they had a past non-violent conviction. To the contrary,

23   early Americans used targeted regulations to prevent dangerous people from committing crimes

24   with guns. Even people feared to be dangerous generally could keep firearms for self-defense. In

---

26   [1] Surely the founding fathers would agree that Mr. Hatch remains a "person" under the Second
27   Amendment, despite his marijuana-related convictions. Many of the founding fathers, including
     Benjamin Franklin, Thomas Jefferson, George Washington and Henry Clay grew and used weed.
     In fact, the "Father of the Constitution," James Madison, claimed that it was weed that gave him
28   the insight to create our great nation.  https://aadl.org/node/193822 (accessed July 14, 2023).

some instances, state courts and Congress recognized that permanent disarmament—even of those who committed treason—was incompatible with the traditional right to bear arms.

*Bruen* provides the only relevant test for determining whether a gun law is constitutional. And because a firearms regulation can no longer be upheld under a "means-end scrutiny," the inquiry ends. Thus, § 922(g)(1) is unconstitutional, and the Court should dismiss the Indictment against Mr. Hatch.

## III.    ARGUMENT

Mr. Hatch firmly believes that the United States constitution guarantees his rights of individual liberties, including, freedom of expression, freedom from unreasonable searches and seizures, and of his Second Amendment right to bear arms for protection and self-defense.

Years ago, Mr. Hatch suffered two non-violent felonies (relating to marijuana) punishable for terms exceeding one year in prison. The Second Amendment states that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. That codified people's pre-existing right to defend themselves from dangers inherent to living among others. *Bruen*, 142 S. Ct. at 2128, 2135. *Bruen* compels the conclusion that § 922(g)(1) impermissibly infringes upon that right. That is no fluke. After all, "[f]elons may need arms for lawful self-defense just as much as the rest of us do." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1499 (2009).

First, *Bruen* laid out a new framework to test any restrictions on one's right to bear arms. That framework abrogates the Ninth Circuit's means-end test for firearm regulations and assumptions that certain types of regulations are constitutional. Second, *Bruen* shows that § 922(g)(1) presumptively violates the Second Amendment because Mr. Hatch's conduct triggers the Amendment's plain text. And finally, a detailed review of the historical record shows that the government cannot meet its burden to show that § 922(g)(1) complies with the Nation's tradition of firearm regulation. Thus, the Court should dismiss the Indictment against Mr. Hatch.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### a. *Bruen* adopted a new approach to the Second Amendment, overruling contrary Ninth Circuit precedent.

#### i. *Bruen* overhauled the test for determining whether government action infringes on the right to keep and bear arms.

To determine whether government action infringes on the Second Amendment, the Ninth Circuit and other federal courts of appeal have applied a two-step test. *See United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013) (discussing cases).

Under this two-step test, the first question was "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id*. (quotations omitted). This step was satisfied if the law "burden[ed] conduct that was within the scope of the Second Amendment as historically understood." *Id*.

If the law burdened conduct covered by the Second Amendment, courts then "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id*. The level of scrutiny applied depended on "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id*. at 1138 (quotations omitted). This could vary between intermediate and strict scrutiny but required more than rational basis. *See id*. at 1137 (citing *Heller*, 554 U.S. at 628 n.27). So at a minimum, courts always assigned *some* weight to the government's interest in public safety and "keeping firearms away from those most likely to misuse them." *Id*. at 1139 (quotations omitted).

But in a watershed opinion, the Supreme Court held that this second step was "one step too many" because only constitutional text and history can justify a firearms regulation. *Bruen*, 142 S. Ct. at 2127. In *Bruen*, the Supreme Court analyzed whether a New York law allowing state authorities to deny gun licenses for lack of "proper cause" violated the applicants' Second Amendment rights. *Id*. at 2123. Under the law's "demanding" standard, state officials had broad discretion to withhold a license unless the individual could "demonstrate a special need for self-protection distinguishable from that of the general community." *Id*. (quotations omitted). *Bruen* observed that at least seven jurisdictions have such "'may issue' licensing laws," under which authorities regularly deny concealed-carry licenses "even when the applicant satisfies the

statutory criteria." *Id*. at 2124. *Bruen* then considered whether such laws violate the Second Amendment.

*Bruen* began by affirming the first step: that courts examine "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." *Id*. at 2127–28 (quotations omitted). This methodology "center[s] on constitutional text and history." *Id*. at 2128–29. Initially, the court must determine whether the individual's conduct falls within "the Second Amendment's plain text." *Id*. at 2126. If it does, then the conduct is "presumptively" constitutional and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2130, 2126. This inquiry requires an examination of the nation's "well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id*. at 2138.

But *Bruen* then declined to conduct the second step, stating that the Court's prior decision in *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), did not support "applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. The Court explained that "[t]he Second Amendment is the very product of an interest balancing by the people" and thus "demands our unqualified deference." *Id*. at 2131 (quotations and emphasis omitted). So even if a firearm restriction *could* satisfy an "interest-balancing inquiry," the "very enumeration of the right takes [it] out of the hands of government." *Id*. at 2129 (quotations omitted). Thus, the "second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id*. at 2129.

Having dismissed the second step, *Bruen* provided guidance on conducting the first-step historical analysis. The Court considered "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id*. But *Bruen* reminded that "not all history is created equal." *Id*. at 2131– 32. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id*. at 2136 (quotations omitted). Because the Second Amendment was adopted in 1791, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions

1   changed in the intervening years." *Id*. Similarly, post-ratification laws that "are inconsistent with

2   the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at

3   2137 (quotations and emphasis omitted).

4       *Bruen* also offered analytical guidance for evaluating historical clues. *Bruen* drew a

5   distinction between two types of regulation. On the one hand, "when a challenged regulation

6   addresses a general societal problem that has persisted since the 18th century," the historical

7   inquiry "will be relatively straightforward." *Id.* at 2131. Courts should begin by deciding whether

8   "a distinctly similar historical regulation address[ed] the problem." *Id*. If earlier generations did

9   not regulate the problem, or if they regulated it "through materially different means," then the

10  challenged regulation may violate the Second Amendment. *Id*. Likewise, comparable regulations

11  as unconstitutional, "that rejection surely would provide some probative evidence of

12  unconstitutionality."

13      In contrast, if a regulation implicates "unprecedented societal concerns," "dramatic

14  technological changes," or regulations "unimaginable at the founding," the "historical inquiry . . .

15  will often involve reasoning by analogy." *Id.* at 2132. Courts may then ask whether historical

16  regulations and the challenged regulation are "relevantly similar," with special attention to "how

17  and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132–

18  33.

19      In either case, the burden falls squarely on the government to "affirmatively prove that its

20  firearms regulation is part of the historical tradition that delimits the outer bounds of the right to

21  keep and bear arms." *Id*. at 2127. If the government cannot do so, the infringement cannot

22  survive.

23      Employing these tools, *Bruen* concluded that New York's law fell under the first category. It

24  implicated a societal problem dating back to the founding: "handgun violence, primarily in urban

25  areas." *Id*. at 2131 (simplified). Thus, there was no need for analogical reasoning and the

26  government bore the burden to show a "comparable tradition of regulation" from the founding

27  era. *See id*. The government, however, had not "demonstrate[d] a tradition of broadly prohibiting

28  the public carry of commonly used firearms for self-defense." *Id*. at 2138. At most, the

government had shown restrictions on some "dangerous and unusual weapons" and "bearing arms to terrorize the people." *Id*. at 2143. Thus, "no historical basis" contradicted "an otherwise enduring American tradition permitting public carry." *Id*. at 2145, 2154.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following:

- If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";

- To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";

- If the government cannot do so, the law is unconstitutional.

*Id*. at 2129–30 (quotations omitted). Accordingly, *Bruen* requires courts to revisit any Second Amendment decision not consistent with this methodology.[2]

### ii. *Bruen* also abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment.

"[W]here intervening Supreme Court authority is clearly irreconcilable" with prior Ninth Circuit authority, "district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). To determine whether a prior opinion was overruled, courts look not only to "'the holdings of higher courts' decisions'" but also their "'mode of analysis.'" *Id*. (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi.

---

[2] Indeed, cases have already been remanded to both the Ninth Circuit and its respective district courts for further consideration considering the Supreme Court's decision in *Bruen. See, e.g.*, *Young v. Hawaii*, 12-17808 (August 19, 2022) (remanding the district court "following the Supreme Court's order vacating this court's judgment and remanding to this court 'for further consideration in light of *New York State Rifle & Pistol Assn., Inc. v. Bruen.*'"); *Rupp v. Bonta*, 2022 WL 2382319, at *1 (9th Cir. June 28, 2022) ("[T]his case is remanded to the district court for further proceedings consistent with the United States Supreme Court's decision in ... *Bruen*"), *Villanueva*, No. 20-56233 (9th Cir. July 6, 2022) (same); *McDougall v. Cnty. of Ventura*, No. 20-56220 (9th Cir. June 29, 2022) (same); *Nichols v. Newsom* (C.D. Cal., Case No. 11-cv-09916) (same); *Baird v. Bonta* (Ninth Circuit Court of Appeals, Case No. 23-15016; E.D. Cal., Case No. 19-cv-617) (same); *Floyd v. San Jose Police Dept., et al.* (Ninth Circuit Court of Appeals, Case No. 22-16243; N.D. Cal., Case No. 22-cv-751) (same).

L.Rev. 1175, 1177 (1989)). Such holdings "need not be identical in order to be controlling" so long as they "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id*. Thus, to the extent *Bruen* employs a different "mode of analysis" than the Ninth Circuit's prior Second Amendment cases, this Court is "bound by" *Bruen*, rather than decisions that are "clearly irreconcilable" with its reasoning. *Id*.

    *Bruen* is clearly irreconcilable with prior Ninth Circuit precedent, such as *Chovan*, 735 F.3d at 1134–37, that applied a "means-end scrutiny." But *Bruen* is also clearly irreconcilable with prior precedent holding that *Heller*'s list of "presumptively lawful" firearms restrictions automatically controls absent a full historical analysis. *See, e.g., United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (relying on *Heller*'s "presumptively lawful" language to deny a Second Amendment challenge to § 922(g)(1)).

    In *Heller*, the Supreme Court confirmed an individual's right to keep and bear arms but cautioned that this right is "not unlimited." 554 U.S. at 626. As an example, the Court provided a non-exhaustive list of "*presumptively* lawful regulatory measures"— i.e., ones that had not yet undergone a full historical analysis. *Id*. at 627 n.26 (emphasis added). This list included laws restricting possession by felons and the mentally ill and the carrying of firearms in "sensitive places." *Id*. at 626. But it also included "prohibitions on carrying concealed weapons," which "the majority of the 19th-century courts" had held were "lawful under the Second Amendment or state analogues." *Id*. Elsewhere, *Heller* confirmed this historical regulation of concealed-carry laws, pointing to multiple state supreme courts decisions holding that the "constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Id.* at 613, 629.

    But *Heller* emphasized that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id*. And since this was the Court's "first in-depth examination of the Second Amendment," *Heller* explained that it could not "clarify the entire field." *Id*. at 635. But *Heller* promised that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id*.

    Fourteen years later, in *Bruen*, one of those *"exceptions"* came before the Court. There, the

justices undertook an "exhaustive historical analysis" of a state licensing regime regulating both open and concealed carrying of firearms. Specifically, New York outlawed open carry and required a showing of "proper cause" before a person could receive a license to "'have and carry concealed' a pistol or revolver." *Bruen*, 142 S. Ct. at 2123 (quoting N.Y. Penal Law §400.00(2)(f)). While acknowledging *Heller*'s preliminary analysis of concealed-carry laws, *Bruen* then conducted a full historical review and reached a more nuanced understanding of the history surrounding such laws. *See id*. at 2146–47. With this new understanding, it held that New York could not, in fact, issue a blanket prohibition on concealed carry or even limit it to those with special self-defense needs. *Id*. at 2156.

Importantly, *Bruen* did not "overrule" *Heller*'s "holding" that concealed-carry laws were presumptively lawful. It merely did what *Heller* promised: conducted an "exhaustive historical analysis" on one of the "exceptions" that had now "come before it." *Heller*, 554 U.S. at 635. *Bruen*'s mode of analysis thus shows that *Heller*'s preliminary list of Second Amendment exceptions do not bind future courts or prevent them from conducting a full historical review that may point to a different conclusion. So as with the New York statute, the application of *Bruen*'s revamped test—rather than *Heller*'s preliminary take—controls.[3] With this, *Bruen* laid the road for determining whether the presumption could be rebutted.

*Bruen*'s mode of analysis abrogates prior Ninth Circuit case law finding felon-in- possession laws constitutional. In *Vongxay*, the Ninth Circuit rejected a Second Amendment challenge to § 922(g)(1) by relying on *Heller*'s "presumptively lawful" language. 594 F.3d at 1115; *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016) (confirming that *Vongxay* was "[b]ased on this language" from *Heller*). *Vongxay* rejected the defendant's claim that this language was "not binding" and deferred to prior precedent upholding "the very type of gun possession restriction that the Supreme Court deemed 'presumptively lawful'" in *Heller*. *Id*. at 1115, 1116. *Vongxay*

---

[3] *Bruen* also contains a smattering of references to "law-abiding" individuals. *Id*. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. But like the concealed-carry and felon-in-possession restrictions, *Bruen*'s test would require the government to prove that the plain text of the Second Amendment refers only to "law-abiding" people and a historical tradition exists of denying firearms to non-"law-abiding" people. *Id*. at 2129–30. For the reasons explained here, the government cannot prove either.

then relied on a line of cases that had upheld felon-in-possession laws under the means-end scrutiny of the second step. *Id*. at 1116–18. Because *Bruen* abolished this second step and showed that *Heller*'s list of "presumptively lawful" exceptions is not binding, *Vongxay* is no longer good law. *See Miller*, 335 F.3d at 900.

Even before *Bruen*, numerous Ninth Circuit judges had noted that there were "good reasons to be skeptical" that any "longstanding prohibition" prevented felons from having guns. *Phillips*, 827 F.3d at 1174; *see also id*. at n.2 (discussing sources that found "little to no historical justification for the practice"). Some judges had also doubted *Vongxay*'s holding that *Heller*'s language "categorically barred" challenges to felon-in- possession laws. *United States v. Torres*, 789 F. App'x 655, 657 (9th Cir. 2020) (Lee, J., concurring). *See also Pena v. Lindley*, 898 F.3d 969, 1006 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) (stating that *Heller*'s "presumptively lawful" language "must be a presumption that is subject to rebuttal"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 692 (9th Cir. 2017) (en banc) (Tallman, J., concurring in part and dissenting in part) (reading *Heller*'s list of "presumptively lawful" exceptions as being "subject to rebuttal"). *Bruen* now confirms what these judges suspected: like the concealed-carry laws that *Bruen* later held unconstitutional, a full historical analysis can rebut *Heller*'s "presumptively lawful" exceptions to the Second Amendment.

### iii.  The Second Amendment's plain text covers Mr. Hatch's conduct.

Mr. Hatch's charged conduct is presumptively lawful because it falls within the Second Amendment's plain text. At the outset, he is "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 580). "[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Because "felons" are not "categorically excluded from our national community," they fall within the amendment's scope. *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting); *Range v. United* States, ___ (3d Cir. 2023) (*quoting Binderup v. Att'y Gen*., 836 F.3d 336, 344 ("That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical.") (Ambro, J.) and *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) ("all people have the right to keep and bear arms," though the legislature may

1  constitutionally "strip certain groups of that right.") (J. Barrett)).

2  //

3  Comparison to other constitutional amendments confirms this view. As *Heller* explained, "the

4  people" is a "term of art employed in select parts of the Constitution," including "the Fourth

5  Amendment, . . . the First and Second Amendments, and . . . the Ninth and Tenth Amendments."

6  *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). It is beyond

7  challenge that felons are among "the people" whose "persons, houses, papers, and effects" enjoy

8  Fourth Amendment protection. Cons Amend. IV; *see, e.g.*, *United States v. Lara*, 815 F.3d 605

9  (9th Cir. 2016). And felons likewise enjoy "the right of the people" to "petition the government

10  for redress of grievances." Const. Amend. I; *see, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039

11  (9th Cir. 2017). If a person with a felony conviction is one of "the people" protected by the First

12  and Fourth Amendments, *Heller* teaches that he is one of "the people" protected by the Second

13  Amendment, too.

14  Additionally, the Second Amendment's plain text protects Mr. Hatch's "proposed course of

15  conduct," *Bruen*, 142 S. Ct. at 2134, that is, "to possess and carry weapons in case of

16  confrontation.'" *Id.* at 2135 (quoting *Heller*, 554 U.S. at 592); *contra* 18 U.S.C. §922(g). Thus,

17  his possession of a firearm is "presumptively guarantee[d]," unless the government meets its

18  burden to prove that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm

19  regulation." *Id.*

20  **iv.   The government cannot show "an American tradition" that**

21  **individuals convicted of a felony may not possess a gun.**

22  The government cannot meet its burden to establish the requisite historical tradition. As in

23  *Bruen*, the "general societal problem" that § 922(g)(1) is designed to address—i.e., felons with

24  access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. Thus, § 922(g)(1)

25  is unconstitutional unless the government shows a robust tradition of "distinctly similar historical

26  regulation." *Id.* The government cannot meet its burden to establish § 922(g)(1)'s historical

27  pedigree for a simple reason: neither the federal government nor a single state barred all people

28  convicted of felonies until the 20th century.5 *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56

UCLA L. Rev. 1551, 1563 (2009). The modern version of § 922(g)(1) was adopted *177 years* after the Second Amendment—far too recently to alter its meaning. *Bruen*, 142 S. Ct. at 2154 n.2 ("[L]ate-19th-century evidence" and any "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Section 922(g)(1) very much contradicts earlier evidence from the relevant historical periods: "(1) . . . early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; [and] (4) Reconstruction." *Id.* at 2135–36. Those periods lack evidence of any analogue to § 922(g)(1).

The government may argue that, historically, *some* jurisdictions *sometimes* regulated firearm use by those considered *presently* violent. But that is not a "distinctly similar historical regulation," *Bruen*, 142 S. Ct. at 2131, for at least three reasons. First, not all people with a felony conviction are presently violent. Second, the historical regulations required an individualized assessment of a person's threat to society. And finally, the historical regulations almost always allowed people deemed violent to still possess weapons for self-defense. Thus, even those convicted of serious crimes— including rebellion—remained entitled to protect themselves in a dangerous world, with firearms if necessary. Those laws' targeted nature makes them a far cry from declaring that any person, convicted of any felony, can *never* possess "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629.6

> v.   **Forever depriving all felons of their right to bear arms does not comport with English history.**

England, before the founding of our nation, did not ban felons from ever again possessing a firearm. *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 717 (2009); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020). To the extent that England sought to disarm various individuals, those regulations usually required a more culpable mental state and made exceptions for self-defense, both features absent from § 922(g)(1). In other words, they are not "distinctly similar" to modern felon-in-possession laws. *See Bruen*, 142 S. Ct. at 2131

For example, it was a crime under the common law to "go[] armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)). But by its plain terms, that offense did not make every person the townspeople found scary a criminal. The common law required that "the crime shall appear to be malo animo, [that is,] with evil intent or malice." *Id.* (quoting *Rex v. Sir John Knight*, 1 Comb. 38, 38–39, 90 Eng. Rep. 330 (K. B. 1686)). In other words, the bearer had to have "the intent to cause terror in others." *Id*. at 2183 (Breyer, J., dissenting) (describing majority's view). That is a much more culpable mental state than §922(g)(1)'s "knowingly." *See* 18 U.S.C. § 924(a)(8).

Second, when England tried to minimize *prospective* use of firearms by those considered dangerous, it was through sureties, not mass disarmament. Marshall, *supra*, at 717. A justice of the peace could demand that someone for "whom there is probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance to the public, that such offence as is apprehended shall not happen; by finding pledges and securities for keeping the peace, or for their good behaviour." *Id.* (quoting 5 William Blackstone, *Commentaries* *386-87 (St. George Tucker ed., 1803) (1767)); *see also* William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) (citing 1 W. Hawkins, *Pleas of the Crown* 60 (1716); 3 Sir Edward Coke, *Institutes of the Laws of England* 160 (1644)). But unlike § 922(g)(1), surety laws still presumed that a person could have arms. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); Marshall, *supra*, at 716–23; *Greenlee*, *supra*, at 260. In other words, the regulation targeted a different class (the violent, not the felonious) and used a different enforcement mechanism (sureties not imprisonment).

Third, to the extent that England tried to disarm whole classes of subjects, it did so on noxious grounds—and still permitted those targeted to keep arms for self-defense. For example, in the age of William and Mary (both Protestants), Catholics were presumed loyal to James II (a catholic trying to retake the throne) and treasonous. Thus, Catholics could keep "Arms, Weapons, Gunpowder, [and] Ammunition," only if they declared allegiance to the crown and renounced key parts of their faith. *See Bruen*, 142 S. Ct. at 2142 n.12 (2022) (*quoting* 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)); *see also* An Act for the more effectually preserving the

Kings Person and Government by disabling Papists from sitting in either House of Parliament, 1 Charles II stat. 2, in 5 Stat. of the Realm at 894–96 (1678). Yet a Catholic could still "keep 'such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defense of his House or Person.'" *Bruen*, 142 S. Ct. at 2142 n.12 (omissions in original) (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). In other words, even when England assumed that Catholics were engaged in mass treason, they still had "a right to own arms for personal defense." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994).

In short, the English never tried to disarm all felons. Rather, they tried to limit the use of firearms by those individuals found to be violent and rebellious. And even those individuals could keep arms for self-defense.

> vi. **Forever depriving all people convicted of a non-violent felony of their right to bear arms does not comport with colonial and Founding-era history.**

"[T]here is little evidence of an early American practice of," *Bruen*, 142 S. Ct. at 2142, forever barring all people convicted of a non-violent felony from ever again possessing a firearm. That is not surprising; the new Nation had a more permissive approach to firearm regulation than England. *See, e.g.*, Rawle, *supra*, at 126. The early United States accepted that those who committed crimes—even serious ones—retained a right to defend themselves. That can be seen in the colonies' and states' statutes, early American practice, and rejected proposals from state constitutional conventions.

> 1. **Founding-era statutes and regulations**

First, no Founding-era statutes or interpretations of the common law barred all felons from possessing firearms. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting); *United States v. Cheste*r, 628 F.3d 673, 679 (4th Cir. 2010); *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring).

To the extent that our then nascent nation sought to disarm classes of people, the regulatory approach was a far cry from § 922(g)(1). For example, the Virginia colony, like England,

1    disarmed Catholics, still viewed as traitors to the crown, who would not "swear an oath abjuring

2    the ecclesiastical authority of the Pope." Robert H. Churchill, *Gun Regulation, the Police Power,*

3    *and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25

4    Law & Hist. Rev. 139, 157 (2007) (citation omitted). But there was an exception for weapons

5    allowed by a justice of the peace "for the defense of his house and person." *Id.* And following the

6    Declaration of Independence, Pennsylvania ordered that those who did not pledge allegiance to

7    the Commonwealth and renounce British authority be disarmed. *Id.* at 159. Thus, to the extent

8    that either regulation would comply with the First Amendment, as understood today, they

9    required a specific finding that a specific person posed a risk of violence to the state.

10        Colonial and Founding-era practice also suggests that committing a serious crime did not

11    result in a permanent disarmament. For example, leaders of the seminal Massachusetts Bay

12    colony once disarmed supporters of a banished seditionist. Greenlee, *supra*, at 263 (citations

13    omitted). Nevertheless, "[s]ome supporters who confessed their sins were welcomed back into the

14    community and able to retain their arms." *Id.* And in 1787, after the participants in Shay's

15    Rebellion attacked courthouses, a federal arsenal, and the Massachusetts militia, they were barred

16    from bearing arms, *for three years*. *Id.* at 268–67. In fact, Massachusetts law required the

17    Commonwealth to hold *and then return* the rebels' arms after that period. Sec'y of the

18    Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893). In other words, one

19    of the first states punished people involved in one of the most serious violent crimes—armed

20    rebellion—with merely a three-year firearm ban and promise to return the weapons used to attack

21    the new government.

22                    2.   **Proposals from state constitutional conventions**

23        Academics and jurists agree that if one seeks even debatable "authority before World War I

24    for disabling felons from keeping firearms, . . . one is reduced to three proposals emerging from

25    the ratification of the Constitution." *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting) (quoting

26    Marshall, *supra*, at 712). These proposals, if relevant at all, do not demonstrate a historical

27    tradition of regulation akin to § 922(g). *See, e.g.*, *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting);

28    *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (en banc) (Sykes, J., dissenting);

1   Marshall, *supra*, at 713; Greenlee, *supra*, at 267; Carlton F.W. Larson, *Four Exceptions in Search*

2   *of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375

3   (2009). As the states' conventions debated ratification, several proposed that the Nation's charter

4   guarantee the right to bear Arms. *Id.*; Greenlee, *supra*, at 265–66; 1 Jonathan Elliott, *The Debates*

5   *in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836). Three such

6   proposals included an arguable limitation on that right. First, New Hampshire's convention

7   proposed that citizens not be disarmed "unless such as are or have been in actual rebellion." 1

8   Elliot, *supra*, at 326. Second, Samuel Adams argued at Massachusetts' convention that "the

9   people of the United States, who are peaceable citizens," should not be deprived of their arms.

10   *Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting) (quoting 2 Bernard Schwartz, *The Bill of*

11   *Rights: A Documentary History* 675, 681 (1971)). Finally, a minority of Pennsylvania

12   delegates—all Antifederalists who opposed ratification8—suggested that persons should not be

13   disarmed "unless for crimes committed, or real danger of public injury from individuals." *Id.* at

14   455 (quoting Schwartz, *supra*, at 662, 665). "[O]nly New Hampshire's proposal—the least

15   restrictive of the three—even carried a majority of its convention." *Id.*

16       As an initial matter, the proposals are an exceptionally weak form of evidence. None made it

17   into the final text. And as *Heller* warns, "[i]t is always perilous to derive the meaning of an

18   adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at

19   590; *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (explaining *expressio*

20   *unius est exclusio alterius*). Furthermore, *Heller* specifically admonished that "the drafting

21   history of the Second Amendment—the various proposals in the state conventions and the

22   debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Heller*, 554

23   U.S. at 604. That is because the Second Amendment was "widely understood to codify a pre-

24   existing right, rather than to fashion a new one." *Id*. If these proposals really codified previous

25   practice, the government should be able to point to Founding-era laws imposing similar firearms

26   restrictions. Yet no such laws exist.

27       There is another issue with relying on these proposals: They differ significantly from one

28   another and from other proposals arising from state conventions. The conventions in Rhode

Island and New York proposed an unqualified version of the Second Amendment right, "[t]hat the people have a right to keep and bear arms[.]" 1 Elliott, *supra*, at 328, 335. Thus, while three proto-Second-Amendment proposals expressly limited who had the right to bear arms, two did not. Nor did the four state constitutions—including those of Pennsylvania and Massachusetts— that adopted a parallel right to arms before the Second Amendment contain any textual limitation on that right. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006). Relying on this drafting history would therefore suggest that "different people of the founding period had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties." *Heller*, 554 U.S. at 604–05.

Yet even if one assumes that the proposed limitations shed light on the actual Second Amendment's meaning, it does not legitimize § 922(g)(1). The former proposed some restrictions on arms for those who engaged in rebellion or violence. The latter bars firearm possession for anyone convicted of a crime punishable by more than a year. Those are not close to analogous. *See* Marshall, *supra*, at 713 (concluding that "these three formulations do not support a lifetime ban on any 'felon' possessing any arms"); Greenlee, *supra*, at 267 (same); Larson, *supra*, at 1375 (same); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (same); *Folajtar*, 980 F.3d at 915 (3d Cir. 2020) (Bibas, J., dissenting) (same); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (same).

### vii.   Execution of felons and the "virtuous citizen" theory

The government almost certainly will argue that two oft-cited American practices—(1) execution of felons and (2) a desire for a virtuous citizenry—show that § 922(g)(1) is nothing new. But as several prominent jurists recently concluded, those arguments lack historical support and are incompatible with modern constitutional doctrine. *Kanter*, 919 F.3d at 453–64 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912, 916–21 (Bibas, J., dissenting); Range, 21-2835 (7th Cir. 2023).

As the Range court noted, any attempt by the government "to analogize those early laws to [Hatch's] situation fall short. That Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime

1   disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily

2   include the lesser: founding-era governments' execution of some individuals convicted of certain

3   offenses does not mean the State, then or now, could constitutionally strip a felon of his right to

4   possess arms if he was not executed. As one of our dissenting colleagues notes, a felon could

5   'repurchase arms' after successfully completing his sentence and reintegrating into society.

6   *Krause* Dissent at 28–29. That aptly describes [Hatch's] situation. So the Government's attempt

7   to disarm [Hatch] is not "relevantly similar" to earlier statutes allowing for execution and

8   forfeiture." *Id.* at 20.

9       "[W]e wouldn't say that the state can deprive felons of the right to free speech because felons

10   lost that right via execution at the time of the founding." *Kanter*, 919 F.3d at 461–62 (Barrett, J.,

11   dissenting). Regardless, by the founding era, execution was not the dominant form of punishment

12   even in England, *see supra*, n.4, and it was even less common in the United States. *Id.* at 459. As

13   James Wilson, a leading Founder, told a Virginia grand jury in 1791, "how few are the capital

14   crimes, known to the laws of the United States, compared with those known to the laws of

15   England!" John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders'*

16   *Eighth Amendment* 52 (2012) (citation omitted). The new Nation also took pride in its

17   comparatively infrequent use of forfeiture. 2 Kent, *supra*, at 386. And to the extent that the

18   Founding-era's and England's approaches to firearm regulation conflict, the former governs. *See*

19   *Heller*, 554 U.S. at 607; *Bruen*, 142 S. Ct. at 2138–39.

20       As for virtue, there is no primary source evidence linking the arms right to a person's

21   virtuousness; historians have cited *one another* to support the "virtue" theory, but they have not

22   identified any supporting Founding-era materials beyond the three proposals from state

23   conventions discussed above. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting); *Folajtar*, 980 F.3d

24   at 916 (Bibas, J., dissenting) (comparing the authorities supporting a virtuousness limitation to a

25   "matryoshka doll"). To the extent that history suggests that the Framers stripped the unvirtuous of

26   certain rights—it was civic rights (such as jury service or voting), not individual rights (such as

27   the freedom of speech). *Kanter*, 919 F.3d at 462–63 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at

28   916 (Bibas, J., dissenting). In fact, conditioning the Second Amendment's protections on

1    virtuousness is inconsistent with *Heller*. *E.g.*, *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting).

2    There is zero evidence that the Framers intended to disarm people by considerations of virtue.

3    As five Third Circuit judges in *Binderup*'s majority noted, "we have found no historical evidence

4    on the public meaning of the right to keep and bear arms indicating that 'virtuousness' was a

5    limitation on one's qualification for the right— contemporary insistence to the contrary falls

6    somewhere between guesswork and *ipse dixit*." *Binderup*, 836 F.3d at 372 (Hardiman, J.,

7    concurring).

8         In sum, "[t]he Founding generation had no laws limiting gun possession by . . . people

9    convicted of crimes." Winkler, *supra*, at 1563 n.67. That the Framers were aware of such

10   proposals and chose a different path is powerful evidence that such limits of firearm possession

11   are not baked into the Second Amendment.

12                    viii.   **Forever depriving all felons of their right to bear arms does not**

13                            **comport with 19th-century history.**

14        American practice and laws during the Nineteenth Century—before and after the Civil War—

15   also confirms that §922(g)(1) does not comport with the "Nation's historical tradition of firearm

16   regulation."11 *Bruen*, 142 S. Ct. at 2135. The United States continued to regulate—but not ban—

17   firearm possession by those feared to be violent. *See Bruen*, 142 U.S. at 2148 (holding that 19th

18   century surety laws allowed people likely to breach the peace to still keep guns for self-defense or

19   if they posted a bond). But, as discussed above, that is not similar to § 922(g)(1). There is no

20   evidence of a precursor to § 922(g)(1)'s broad, class-based ban. In fact, there are at least two

21   documented instances where attempts to disarm a class of offenders was rejected as inconsistent

22   with the right to bear arms.

23        First, as with Shay's Rebellion, Congress declined to disarm southerners who fought against

24   the Union in the Civil War. *Whether the Second Amendment Secures an Individual Right*, 28 Op.

25   O.L.C. 126, 226 (2004). The reason: some northern and Republican senators feared that doing so

26   "would violate the Second Amendment." *Id.*

27        Second, when a Texas law ordered that people convicted of unlawfully using a pistol be

28   disarmed, it was struck down as unconstitutional. *Jennings v. State*, 5 Tex. Ct. App. 298, 298

1   (1878). The Texas Court of Appeals—then the state's highest court for criminal cases—held:

2

3           The Legislature has the power by law to regulate the wearing of arms, with a
            view to prevent crime, *but it has not the power to enact a law the violation of*
            *which will work a forfeiture of defendant's arms*. While it has the power to
4           regulate the wearing of arms, it has not the power by legislation to take a citizen's
            arms away from him. *One of his most sacred rights is that of having arms for his*
5           *own defence and that of the State*.

6   11 *Bruen* discusses 19th-century American history before and after the Civil War in distinct

7   chapters. *See* 142 S. Ct. at 2145–54. Because much of the relevant history is thematically similar

8   during those periods, Mr. Hatch combines those sections here in the interest of brevity.

9           This right is one of the surest safeguards of liberty and self- preservation. *Id.* at 300–01

10  (emphases added). Although *Jennings* interpreted Texas's constitution, not the Second

11  Amendment, its analysis is indicative of how firmly states believed that everyone had a

12  fundamental, preexisting right to own firearms for self-defense—even those who had misused

13  firearms in the past. *Jennings*' setting is notable. As *Bruen* held, 1870s Texas otherwise imposed

14  unusually strict firearms regulations. 142 S. Ct. at 2153.

15          In sum, the 19th century history provides clear evidence that mass disarmament for people

16  convicted of an offense is unconstitutional. Not only was there a consistent practice of allowing

17  people who broke the law to keep weapons for self-defense—at least one state appellate court and

18  Congress agreed that disarming lawbreakers was unconstitutional. As *Bruen* teaches: "[I]f some

19  jurisdictions actually attempted to enact analogous regulations during this timeframe, but those

20  proposals were rejected on constitutional grounds, that rejection surely would provide some

21  probative evidence of unconstitutionality." 142 S. Ct. at 2131.

22              ix.   **Although 20th-century history is irrelevant to the Second**

23                    **Amendment's scope, it confirms that § 922(g)(1) is incompatible with**

24                    **the Nation's history and tradition of firearm regulation**

25          Because laws disarming anyone convicted of a felony did not appear until the 1900s, they

26  cannot shed light on this Nation's history and tradition of firearm regulation. The Court spoke

27  without qualification: "20th-century evidence . . . does not provide insight into the meaning of the

28  Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. But

Congress did not pass § 922(g)'s precursor until 1938. Federal Firearms Act (FFA), ch. 850, § 2(e), 52 Stat. 1250, 1251. And even that law was a far cry from § 922(g)(1). It merely criminalized *receiving* a firearm *in interstate commerce* by those convicted of a "crime of violence," which meant "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," or various forms of aggravated assault. *Id.* §§ 1(6), (2)(e), 52 Stat. at 1250–51. Congress did not extend its proscription to all felons and *possession* of any firearm that had *ever* traveled in interstate commerce until 1968. Marshall, *supra*, at 698–99.

The Second Amendment requires more. In *Bruen*, the Court declined to even consider 20th-century evidence because it was so out of step with historical practice. 142 S. Ct. at 2154 n.28. This Court should do the same.

> **b.   This Court should dismiss or, at minimum, hold an evidentiary hearing.**

The government charged Mr. Hatch as being a felon who "possess[ed] a firearm" under 18 U.S.C. § 922(g)(1). But because the government cannot "meet [its] burden to identify an American tradition" that prohibited people with non-violent felonies from possessing firearms, § 922(g)(1) "is therefore unconstitutional." *Bruen*, 142 S. Ct. at 2138. At a minimum, the government must present evidence of a historical tradition that would have prohibited a person in Mr. Hatch's circumstances from possessing a firearm. If it cannot, the Court should dismiss the Indictment against Mr. Hatch.

**IV.    CONCLUSION**

For the foregoing reasons, the Indictment against Mr. Hatch should be dismissed.

Dated:  July 14, 2023                          Respectfully submitted,

                                                /s/ Meghan Blanco

                                                MEGHAN A. BLANCO
                                                DAMON ALIMOURI
                                                Attorneys for Defendant
                                                TORRENCE HATCH