1  TARA K. McGRATH
2  United States Attorney
   ASHLEY KAINO-ALLEN
3  Assistant U.S. Attorney
4  Texas Bar No. 24099412
   880 Front Street, Room 6293
5  San Diego, CA 92101
   Tel: (619) 546-8835
6  Email: ashley.kaino-allen@usdoj.gov
7  Attorney for the United States

**United States District Court**

**Southern District of California**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>TORRANCE IVY HATCH,<br><br>    Defendant. | Case No. 3:23-CR-1201-CAB<br><br>**UNITED STATES' RESPONSES IN OPPOSITION TO DEFENDANT'S:**<br>1. **MOTION TO SUPPRESS**<br>2. **MOTION TO COMPEL DISCOVERY**<br><br>Date: March 7, 2024<br>Time: 10:00 a.m.<br>Courtroom: 15A<br>Hon. Cathy Ann Bencivengo |

The United States of America asks the Court to deny Defendant Torrance Ivy Hatch's motions to suppress and compel discovery. ECF Nos. 61, 62. The United States provides the following response to these motions and attaches two exhibits.

//
//
//
//

Sealed[1] Exhibit 1 includes three videos:

- two videos of Defendant Hatch's post-arrest interview[2] ("Interview") and
- one body worn camera video clip ("BWC Clip") capturing the Defendant and paramedics after the traffic stop.[3]

Exhibit 2 is a certified transcript of Defendant's post-arrest interview video. The United States redacted Defendant's date of birth for this public filing. Ex. 2 (Transcript) at 3:18.

# I.
# Background

## A. Statement of Facts

The United States incorporates the facts summarizing the offense set forth in the complaint and motion to revoke conditions of stay. ECF Nos. 1, 22.

San Diego Police Department ("SDPD") officers saw a person later identified as Defendant Torrance Ivy Hatch ("Defendant" and "Hatch") in a live Instagram video with a black firearm tucked in the back waistband of his pants. SDPD later stopped a vehicle with Hatch as a passenger, and found a black handgun (matching the description of the firearm in the video) in the backseat of the vehicle between Hatch and his employee, bodyguard Billy Ray Johnson.

### i. Defendant receives medical attention after the traffic stop.

At Defendant's request, SDPD Officers tested his blood sugar at the scene of the traffic stop. SDPD called for medical assistance and San Diego Fire Department ("SDFD") responded. SDFD evaluated Defendant—who rejected the offer to be taken

---

[1] Exhibit 1 is sealed because personally identifiable information is heard on the videos.

[2] The two post-arrest interview videos are the same footage from two camera angles. The original videos were produced to Defense Counsel on June 21, 2023. The United States provided the videos converted into a different file format on February 28, 2024.

[3] BWC Clip was produced to the Defense on March 1, 2024, and is a shortened version of a full body worn camera video file produced to Defense on June 21, 2023.

to a hospital—and was cleared by the paramedic. Ex. 1 (BWC Clip).  Hatch himself said during the post-arrest interview: ". . . [T]hat officer . . . gave me some—they found my—my sugar stuff in my bag and squirted the stuff in my—the sugar in my mouth." Ex. 1 (Interview) at 17:24:01–17:24:09; Ex. 2 (Transcript) at 9:23–10:1.

Defendant was arrested and taken into custody.

### ii. *During the interview, Defendant interrupts Detectives' attempts to explain his* Miranda *rights.*

The interview started at 17:16:50 hours with SDPD Detectives Sharrieff and Williams bringing Defendant into an interview room. The interaction was recorded and lasted 11 minutes and 6 seconds. Detectives attempted numerous times to provide Defendant with his *Miranda* rights, but Defendant repeatedly interrupted them. Below lists the detectives' attempts:

1. Detective Sharrieff: ". . . I have some questions for you, but in order for me to ask you questions, I'm going to have to read you your rights." Ex. 1 (Interview) at 17:17:30–17:17:35; Ex. 2 (Transcript) at 2:19–21.

2. Detective Sharrieff: "I'm looking out for your rights, brother. You're under arrest. Okay? Let me read you your rights. You can decide if you want to keep talking. You have the right to remain silent. If you give up the right to remain silent—" Ex. 1 (Interview) at 17:18:56–17:19:05; Ex. 2 (Transcript) at 4:2–7.

3. Detective Sharrieff: "Well, let me finish reading your rights. You have the right to remain silent." Ex. 1 (Interview) at 17:19:15–17:19:17; Ex. 2 (Transcript) at 4:15–16.

4. Detective Sharrieff: "Torrance, let me read you your rights—" Ex. 1 (Interview) at 17:19:23–17:19:24; Ex. 2 (Transcript) at 4:21–22.

5. Detective Williams: "Hey, bud, let Det. Sharrieff get through this." Detective Sharrieff: "You have the right to remain silent." Defendant interrupted, but Detective Sharrieff continued to say: "Anything you do say

3

      can be used against you in court." Ex. 1 (Interview) at 17:19:35–17:19:44; Ex. 2 (Transcript) at 5:1–7.

6. Detective Williams: "Can we get through this, please?" Ex. 1 (Interview) at 17:20:23–17:20:25; Ex. 2 (Transcript) at 5:25–23.

7. Detective Sharrieff: "I hear you. But in order for me to ask you questions about what we know, I'm gonna have to finish reading you your rights. Can we go through this?" Ex. 1 (Interview) at 17:20:35–17:20:42. *See* Ex. 2 (Transcript) at 6:5–7.

8. Detective Sharrieff: "Do you want me to continue or do you want me to tell you what we know?" Ex. 1 (Interview) at 17:21:38–17:21:41; Ex. 2 (Transcript) at 7:5–6.

9. Near the end of the video, Detective Sharrieff: "That's why I want to ask you questions." Ex. 1 (Interview) at 17:26:17–17:26:18; Ex. 2 (Transcript) at 11: 21–22.

10. Near the end of the video, Detective Sharrieff: "That's why I wanted to ask you, but I have to read you your rights first." Ex. 1 (Interview) at 17:26:20–17:26:23; Ex. 2 (Transcript) at 11:24–25.

Defendant repeatedly requested that detectives speak with SDPD officers from the traffic stop and review the body camera footage. About halfway through the interview, Detective Sharrieff said they would end the interview and he would go look at the body worn camera footage. Ex. 1 (Interview) at 17:22:03; Ex. 2 (Transcript) at 7:13–15. Only after this point did Detective Williams leave the room for a period of 3 minutes and 24 seconds. Ex. 1 (Interview, on View 2 only) at 17:23:25–17:25:49.

        ***iii.   During the interview, Defendant explains his medical condition.***

When discussing his diabetes, Defendant stated: ". . . [A]t the time when they—when they arrest me, I was having sugar attack, so they had to call paramedics. But, bro —." Ex. 1 (Interview) at 17:23:52-17:23:58; Ex. 2 (Transcript) at 9:18–20. In response, Detective Sharrieff asked: "Are you have a sugar attack now?" Ex. 1 (Interview) at

4

17:23:59-17:24:02; Ex. 2 (Transcript) at 9:21–22.  Defendant responded: "Nah, they— that officer saved me, bro. Actually saved me. Gave me some—they found my—my sugar stuff in my bag and squirted the stuff in my—the sugar in my mouth." Ex. 1 (Interview) at 17:24:01–17:24:09; Ex. 2 (Transcript) at 9:23–10:1.

### iv. *During the interview, Detective Williams brings in a photo.*

Once Detective Williams returned to the room, he placed a snapshot of the Instagram live video on the table and the following exchange occurred:

- Detective Williams: "This is why you're down here."
- Defendant: "Why I'm down here?"
- Detective Williams: "Yes at police headquarters. The gun in your waistband."
- Defendant: "I know, I had to put that on for the viddy."
- Detective Williams: "I'm just letting you know. Okay?"

Ex. 1 (Interview View 2) at 17:25:49–17:26:07; Ex. 2 (Transcript) at 11:7–14.

Defendant proceeded to explain the screenshot, Detective Sharrieff said he needed to read Defendant his rights[4], and the interview ceased with everyone leaving the room within the next two minutes. Ex. 1 (Interview) at 17:26:29-17:27:20; Ex. 2 (Transcript) at 12:5–13:1.

Defendant now seeks suppression of his post-arrest, pre-*Miranda* statements. *See* ECF No. 61. The parties do not dispute that Defendant was in custody, but whether Defendant was interrogated. The United States provides three videos and a transcript for the Court's consideration.

### B. Procedural History

Defendant was charged by indictment on June 21, 2023, with Possession of a Firearm and Ammunition, in violation of Title 18, U.S.C., Section 922(g)(1). Preliminary records checks revealed that Defendant has two felony convictions in 2011,

---

[4] Ex. 1 (Interview) at 17:26:20 –17:26:23; Ex. 2 (Transcript) at 11:24–25.

including bringing illegal contraband to a penal institution and possession of a controlled substance with intent to distribute.

On February 15, 2024, Defendant filed the motions now pending before this Court to include suppressing his statements made during what he claims to be "the functional equivalent of an interrogation." ECF Nos. 61 at 6, 62.

## III.
## Response to Defendant's Motion to Suppress

A custodial interrogation can include express questioning and techniques of persuasion; however, not all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980).

Defendant's motion to suppress evidence should be denied because Defendant was not interrogated or subjected to a functional equivalent of an interrogation. Detectives repeatedly attempted to advise Defendant of his *Miranda* rights but were unsuccessful because Defendant repeatedly and spontaneously interrupted their attempts throughout the 11-minute-long interview. Defendant's statements were voluntary and, based on his own words and actions, were not during a diabetic episode. The circumstances here do not justify suppression.

> **A. Detectives were unable to advise Defendant of his Miranda rights due to his repeated voluntary, spontaneous statements.**

*Miranda* warnings are intended to reduce the risk that an involuntary or coerced statement will be admitted at trial and implicate the Fifth Amendment's Self-Incrimination Clause. *See United States v. Williams,* 435 F.3d 1148, 1151–52 (9th Cir. 2006). But here, the post-arrest video makes abundantly clear that SDPD detectives repeatedly attempted to advise Defendant of his *Miranda* rights and were unable to do so because of his continuous interruptions. During the 11-minute interview, Detectives referred or alluded to *Miranda* rights ten times and only three of those times could they administer any of the *Miranda* warnings. Defendant interrupted to state his opinions

about the traffic stop, explain the Instagram live screenshot, say the gun was in the bag and not on the seat, ask about bond, ask detectives to speak to the SDPD officers, and ask detectives to review the body worn camera footage. In the end, the reason there is not a full *Miranda* admonishment here is because of the Defendant's constant interruptions throughout the interview, even though he heard that he had the right to remain silent at three separate points.

### B. Defendant's statements were not the result of an interrogation or "the functional equivalent of an interrogation."

For Miranda purposes, the term "interrogation" refers to any words or action on the part of the police, other than those normally attendant on arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Innis*, 446 U.S. 291. "Subjecting a suspect to 'subtle compulsion,' without more, is not the functional equivalent of interrogation." United States v. Morgan, 738 F.3d 1002, 1006 (9th Cir. 2013) (quoting Innis, 446 U.S. at 303). It must be established that a suspect's incriminating response is "the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." Id. "Voluntary statements of any kind are not barred by the Fifth Amendment" and a statement given freely and voluntarily without compelling influences is admissible in evidence because the police need not stop a person who wants to confess to a crime. *Id.* at 299 (*quoting Miranda v. Arizona*, 384 U.S. 436 (1966)).

Here, Hatch's statements were completely voluntary and spontaneous, and detectives' statements and actions did not elicit an incriminating response.

### i. Defendant's statements were spontaneous.

It has long been held that spontaneous statements are not covered by *Miranda* because they are not the product of interrogation. *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). *Miranda* applies only "where a suspect in custody is subjected to interrogation." *Cox v. Del Papa*, 542 F.3d 669 (9th Cir. 2008) (citing *Innis*, 446 U.S.

291, 300 (1980)). It does not apply to spontaneous statements. Nor does it "'prohibit the police from merely listening to . . . voluntary, volunteered statements' uttered by a person, whether or not in custody, 'and using them against him at the trial.'" *People v. Mickey*, 818 P.2d 84, 98 (Sup. Ct. Cal. 1991) (quoting *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)).

As outlined in the summary of facts above and demonstrated in the videos and transcript, the defendant's statements were not the product of interrogation, but were unprompted, volunteered, spontaneous statements. For example, when Detective Sharrieff started reading *Miranda* warnings the first time, Defendant spontaneously asked about bond and the charge. Ex. 1 (Interview) at 17:19:04–17:19:14; Ex. 2 (Transcript) at 4:6–14. The second time: Defendant spontaneously said the officers lied about the gun being on the seat. Ex. 1 (Interview) at 17:19:16–17:19:22; Ex. 2 (Transcript) at 4:17–25. The third time: Defendant spontaneously said that he had marijuana in his hand and the guns were in the bodyguard's bag. Ex. 1 (Interview) at 17:19:38–17:20:02; Ex. 2 (Transcript) at 5:8–13. All his statements throughout the video were the same form of spontaneity and were not the result of an interrogation or a functional equivalent. Therefore, they are not protected by *Miranda* and should not be suppressed.

### ii. Defendant's statements were voluntary.

A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43 (1897). "Coercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157 (1986), and whether a confession was voluntary turns on whether the defendant's will was in fact overborne. *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996) (citing *Miller v. Fenton*, 474 U.S. 104 (1985)).

Nothing in this case suggests coercive police activity occurred here. The interview took place about one hour after Hatch's arrest, well within the six-hour "safe harbor" period contemplated by 18 U.S.C. § 3501(c). Detectives Sharrieff and Williams never made physical contact with the defendant or used physical punishment, did not promise the defendant any benefits or make any threats, and spoke calmly and politely throughout the 11-minute interview. They did not speak over Defendant or escalate the situation even when Defendant raised his voice at them numerous times.

### a. *Defendant's diabetes did not negate his voluntariness.*

Defendant alleges he experienced a "surge in symptoms" because his blood sugar was too low at the time of the interview (ECF number 61); however, he refused medical transport to a hospital, was medically cleared, and his recorded statements are entirely coherent.

At the scene of the traffic stop, SDPD administered a blood test using Defendant's personal diabetic equipment and called for medical assistance. SDFD arrived and gave Defendant the choice to be taken to the hospital; however, he declined. Ex. 1 (BWC Clip) at 15:55:07–15:55:31. SDFD evaluated Defendant by conducting their own diabetic blood tests. Ex. 1 (BWC Clip) at 15:56:38–15:56:03. The paramedic announced "157" as the blood test level result, made an "OK" hand symbol to the Defendant, followed by saying "excellent" and "heading in the right direction." Ex. 1 (BWC Clip) at 15:57:15–15:57:20. The paramedics began to pack up their equipment and SDPD continued with taking Defendant into custody.

During the post-arrest interview, Defendant's responses were commensurate with the questions posed about his identity and detectives' declarative statements. Detective Sharrieff even asked if Defendant was having a diabetic episode, and Defendant responded "Nah . . ." Ex. 1 (Interview) at 17:24:01; Ex. 2 (Transcript) at 9:23. Defendant had this opportunity to tell Detective Sharrieff if he was having any issues and he did not. Instead, Defendant acknowledged that he was treated for low blood sugar and recognized one officer's actions: ". . . [T]hat officer saved me bro, actually saved me.

9

Gave me some—they found my sugar stuff in my bag and squirted the stuff the sugar in my mouth." Ex. 1 (Interview) at 17:24:01–17:24:09; Ex. 2 (Transcript) at 9:23–10:1.

Defendant's claims are entirely unsupported by the evidence and his statements were voluntary.

### iii. Detectives did not elicit incriminating responses.

The Ninth Circuit has held in multiple cases that an interview is not a functional equivalent of an interrogation where law enforcement poses a question, makes a declarative statement, or shows a photo. In *United States v. Moreno-Flores*, the statements did not invite a response from the suspect where Moreno invoked his right to remain silent and, the next morning, voluntarily made inculpatory statements in response to the case agent's question about how his night in custody was. 33 F.3d 1164, 1168–70 (9th Cir. 1994). Similarly, in *Shedelbower v. Estelle*, an officer telling the defendant that his accomplice was in custody and that the victim identified defendant as one of her perpetrators was not the functional equivalent of interrogation because they were not the type of comments to elicit an incriminating remark. 885 F.2d 570, 573 (9th Cir. 1989). Additionally, in *United States v. Davis,* showing defendant a surveillance photo of him participating in a bank robbery was not an interrogation. 527 F.2d 1110 (9th Cir. 1975). Davis was questioned by the FBI and indicated he did not want to talk. *Id.* An agent showed him a photo and said: "Are you sure you don't want to reconsider?" and Defendant responded: "Well, I guess you've got me" and then signed the *Miranda* waiver form. *Id.*

Detectives did not elicit incriminating responses by allowing Defendant to speak. They did not interfere with the Defendant's choice to continuously speak in a stream-of-consciousness manner throughout the entire interview. The fact that Defendant was not Mirandized due to his own interruptions does not negate that multiple attempts were made or convert the communications into an interrogation.

The videos and transcript show that detectives wanted to speak with Defendant and tried to Mirandize him so they could ask him questions. They did not elicit incriminating

information because Defendant made a point to be heard and speak his mind regardless of what Detectives said or did. Detectives only intermittently made declarative statements and posed questions for the purpose of responding to Defendant's requests, providing him information, and confirming his welfare. Aside from the detective's attempts to Mirandize Defendant, they:

1. asked for Defendant's identifying information[5];
2. answered Defendant's questions about bond[6];
3. responded to Defendant questions about speaking with the officers and his request to review the body worn camera footage[7];
4. expressed acknowledgment of what Defendant had to say[8];
5. questioned whether Defendant physically felt ok[9]; and
6. informed him of his charges, advised that he's in custody, and stated that they wanted to gather additional information from him.[10]

Before Detective Williams showed Defendant the Instagram live screenshot, Defendant was focused on the traffic stop and displayed a high level of emotion by speaking loudly and repeatedly stating it was a "bad charge" because the "guns were in the bag" and "not on the seat." *See* Ex. 2 (Transcript) at 3:13; 5:5–7.   When Detective Williams presented the photo, he intended to explain that the charge was beyond the scope of the traffic stop and respond to Defendant's specific questions, not to elicit an incriminating response. Defendant continued to make voluntary, spontaneous statements to explain himself and provide his opinions, which does not convert this interview into the functional equivalent of an interrogation.

---

[5]Ex. 2 (Transcript) at 3:4–14.
[6]Ex. 2 (Transcript) at 4:9–11.
[7]Ex. 2 (Transcript) at 5:14–15, 6:11, 7:6, 7:9–17, 8:18–19, 10:4 (based on context), 10:14 (based on context), 12:19–13:1 (based on context).
[8]Ex. 2 (Transcript) at 2:12–14, 8:14, 9:3–9:14, 11:3–5.
[9]Ex. 2 (Transcript) at 9:21–22.
[10]Ex. 2 (Transcript) at 2:18–3:6, 4:13–15, 5:17–21, 6:22–7:9, 7:19–23; 8:4–8; 8:22, 11:7–11:22, 12:3–4.

### C. *An evidentiary hearing is unnecessary because there are no disputed facts and Defendant has failed to properly support his motion.*

Under the local rules, "[t]he Court need not grant an evidentiary hearing where either party fails to properly support its motion or opposition." Crim. L.R. 47.1(g)(1). Defendant has failed to properly support his motion because he has not provided a factual or legal basis for suppression of evidence in this case. The facts before the Court are undisputed: there is no dispute that *Miranda* warnings were not finished and what statements were made and by whom. An evidentiary hearing is unnecessary, and this request should be denied.

## II.

## Response to Defendant's Second Motion to Produce Discovery

### A. *Status of Discovery*

The United States has complied, and will continue to comply, with its discovery obligations. To date, it has produced about 220 pages of discovery, including 38 videos, one audio file, and 18 text transcripts. The discovery contains arrest reports, criminal history reports, copies of booking documents, video surveillance, videotaped post-arrest statements, photographs, and judgment/conviction documents.

### B. *Motion to Compel Discovery*

The government is aware of and will continue to comply with its discovery obligations. It recognizes and will comply with its obligations under Rule 16 and the Jencks Act, and it is aware of and will satisfy its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The United States also will conduct an inquiry pursuant to *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), as appropriate, and fulfill its obligations thereunder. Accordingly, Defendant's discovery motions should be denied, and no order requiring production of specific evidence should be issued at this time.

###### i.  *Results from the SDPD administered blood test*

Defendant requests the "results of the blood sugar test SDPD administered following Mr. Hatch's arrest." ECF No. 62 at 2. However, any currently available test results are held by the Defendant.

Based on the information known to the United States, SDPD used Defendant's personal glucose meter and test strips. *See* Bates 15. Results would have been displayed on the device itself and there is no documentation regarding a physical report or result from Defendant's personal device. SDPD only took custody of the single used test strip as evidence and Defendant's diabetic kit was put into his personal property, which was released on May 7, 2023 when he was released from custody. Bates 213; *See* Bates 214. The United States has produced a property report listing the blood test strip and two pictures of the evidence. Bates 27, 215–216.

###### ii.  *Treatment by San Diego Fire Department*

Although not requested by Defense, the United States sought any SDFD records relating to their treatment of Defendant on May 6, 2023. The only items received were one audio file of a dispatch recording and one call detail record. The United States received the items on February 29, 2024, and produced them the next day.

## IV.
## Conclusion

Defendant's motion to suppress should be denied. Defendant's interview was not an interrogation or a function equivalent of an interrogation. His statements were entirely voluntarily and spontaneous while Detectives' tried to advise him of his *Miranda* rights. Because Defendant's motion has no factual or legal basis nor is there a factual dispute, the motion should be denied without an evidentiary hearing.

//
//
//
//

13

     Defendant's motion to compel evidence and preserve evidence should be denied because the United States has complied and will continue to comply with its discovery obligations, and no specific order to compel is necessary.

Respectfully submitted,

Tara K. McGrath
United States Attorney

*/s/ Ashley Kaino-Allen*
Ashley Kaino-Allen
Assistant U.S. Attorney
